## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DARYL SCOTT**,

        Plaintiff,

        v.                           Case No. 1:17-cv-02301 (TNM)

**UNITED STATES**,

        Defendant.

## MEMORANDUM OPINION

    The plaintiff in this case seeks to overturn his court-martial conviction of rape based on misfeasance by the DNA analyst in unrelated cases.

    Daryl Scott was a hospital corpsman at the U.S. Naval Hospital in Okinawa, Japan. One night after work in 2001, he met up with a few of his friends to go out drinking. He returned to the naval barracks later that evening with three servicemembers, including a woman who was so intoxicated that she could not walk unassisted. The group helped her to her room before disbanding. Mr. Scott remained behind and saw the woman lay down on her bed. He noticed that she was incoherent and passing in and out of consciousness. So he got in the bed and began kissing her.

    Mr. Scott claims that he does not remember what happened next. When the woman woke up in the morning, she was covered in blood. She was wearing a pair of white boxers that were not hers. The tampon she had been using the night before was lying on the floor. The sheets on her bed were missing. Feeling scared and confused, she reported the incident to her chain of command. An investigation by the Naval Criminal Investigative Service ("NCIS") found a stain on the woman's mattress that contained a mixture of her and Mr. Scott's DNA.

Based on these facts, Mr. Scott pled guilty to raping the woman. He told a military judge he had no reason to believe that the victim and witnesses were mistaken about his actions, and that he was convinced of his guilt. After inquiring into its factual basis, the military judge accepted Mr. Scott's plea. He was discharged from the Navy and sentenced to seven years' incarceration. Under a pretrial agreement, the confinement was reduced to four years. He served this sentence and currently lives in Pine Ridge, South Dakota.

Mr. Scott now collaterally attacks his court-martial conviction. He contends that an NCIS analyst fabricated the DNA evidence brought against him. He also believes that the military courts violated the U.S. Constitution and the Administrative Procedure Act ("APA") by refusing to adequately re-consider his case.

The Court disagrees. It finds that Mr. Scott has not adduced facts sufficient to support his claim of falsified evidence. Even if he could present such facts, his guilty plea was based on much more than just the results of DNA testing. His allegations were fully and fairly considered by the military tribunals. And the statutory scheme created by Congress precludes an APA review of Mr. Scott's case. The Court will thus grant the Government summary judgment on Mr. Scott's constitutional claims and will dismiss his APA claims.

## I.

Before accepting a guilty plea, "a military judge must conduct a thorough inquiry to insure the accused understands the meaning and effect of the plea, that he enters it voluntarily, and that he in fact is guilty of the offense." *United States v. Roane*, 43 M.J. 93, 98 (C.A.A.F. 1995) (discussing Art. 45(a), Uniform Code of Military Justice). The purpose of this "providence inquiry" is to establish a sufficient basis in law and fact for accepting an accused party's guilt. *See United States v. O'Connor*, 58 M.J. 450, 453 (C.A.A.F. 2003). "In this

respect, military practice differs from that in other federal courts that permit the accused to plead guilty even though the defendant personally professes innocence—a so-called '*Alford* plea.'" *Roane*, 43 M.J. at 98 (citing *North Carolina v. Alford*, 400 U.S. 25 (1970)).

Consistent with this requirement, a military judge conducted an extensive providence inquiry before accepting Mr. Scott's guilty plea. A.R. 9-25. During the inquiry, Mr. Scott conveyed that he had read, understood, and agreed with a stipulation of facts concerning his conduct. A.R. 13. The stipulation stated that:

- "At no time that evening did [the woman] give [Mr. Scott] any indication that she was interested in [him] sexually or romantically;"

- The woman "was highly intoxicated as a result of drinking alcoholic beverages that evening and could not walk by herself to her barracks room;"

- Mr. Scott "knew that [the woman] was intoxicated . . . because [he] had seen her consume many beers throughout the late evening and early morning;"

- Mr. Scott saw that the woman "was not coherent and passed in and out of consciousness;"

- Mr. Scott "remember[s] lying side by side with her and kissing her;" and

- The next morning, Mr. Scott "returned to [the woman's] room and realized that [he] had committed a sexual act with someone who was unable to give her consent because she was too intoxicated. [He] was scared that someone might see [him] leaving the room, so [he] locked [her] door from the inside and left through her window." A.R. 34-35.

The military judge also asked Mr. Scott to describe, in his own words, what happened that night.  A.R. 21.  He did so.  He also confirmed his belief that he "completed this act of sexual intercourse and without the consent of" the woman.  A.R. 23.

Though Mr. Scott claimed not to remember the details of the assault, he believed the NCIS investigation was "accurate and reliable."  A.R. 20.  He said he had no reason to doubt the accounts of the victim and witnesses.  A.R. 20-21.  And he confirmed that "despite the fact that [he] cannot remember what happened  . . . [he is] still guilty of raping" the woman.  A.R. 21.

Contrary to the normal procedure in federal court guilty pleas, the judge also heard testimony from the victim.  She described waking up covered in blood, wearing boxer shorts that did not belong to her, and seeing her tampon lying on the floor.  A.R. 29.  Her bed sheets were missing, and her curtain was pulled aside.  This was something she never did "because [she] live[d] on the first deck."  *Id*.  After considering her testimony, the NCIS investigative report, and Mr. Scott's admissions, the military judge found him guilty of rape.  A.R. 36.

Roughly two years later, Mr. Scott filed the first of several appeals contesting his conviction.  A.R. 38-46.  He argued that he had "pled guilty to a rape that was alleged by nobody and that may have never occurred," as neither he nor the woman "remember[ed] whether he had intercourse with her."  A.R. 39.  He attacked the DNA evidence against him, suggesting that the mixture of his semen and her blood found by NCIS "could have just have [sic] easily occurred outside the vagina."  A.R. 42.  Thus, he insisted, the military judge's providence inquiry was deficient, as he "failed in his duty to ask the difficult questions, the ones that would have caused him to reject the [guilty] plea."  A.R. 44.

The Navy-Marine Corps Court of Criminal Appeals ("Navy Appeals Court") rejected these arguments.  It found that he "indicated an understanding of the elements of the offense . . .

and stated that the elements correctly described the offense he committed." A.R. 60. Mr. Scott also "clearly stated, in his own words, the circumstances surrounding the rape." *Id*. The Navy Appeals Court concluded that "[a]lthough the appellant was unable to remember having engaged in intercourse with the victim, his inability to remember does not invalidate the plea where the appellant was convinced of his guilt based on the strength of the evidence against him." *Id*.

Three years after this denial, Mr. Scott tried again. He filed a writ of error *coram nobis* with the Navy Appeals Court. This time, he asked for an evidentiary hearing "in light of newly disclosed evidence of the general mishandling of [DNA] evidence" at an NCIS criminal investigation laboratory. A.R. 62. Mr. Scott argued that the DNA results in his case were "the only reason Appellant believed he had raped" the woman, and that if these "results were in fact fabricated, the 'strength' of the evidence against Appellant would evaporate." A.R. 64.

His challenge arose out of a memorandum issued by the laboratory. It noted that an analyst falsified an entry on one of the DNA tests he had conducted, and that the same analyst had once been suspended after "permitting contamination in his testing processes." A.R. 76. Upon discovering this issue, the laboratory began "reviewing the hundreds of cases worked on by this examiner," and stated that "[a]s of this writing, no false reports are believed to have left the laboratory." *Id*. Mr. Scott characterized this as "newly discovered evidence" that "sheds new light on the reliability of Appellant's conviction." A.R. 65. He urged the court to order more DNA testing through a "*DuBay* hearing." *See United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967).[1]

---

[1] A *DuBay* hearing is "essentially an evidentiary hearing to resolve collateral factual issues, usually ordered by an appellate military court . . . to aid in appellate review." *Cothran v. Dalton*, 83 F. Supp. 2d 58, 69 (D.D.C. 1999).

The court declined to do so.  The basis for Mr. Scott's request, it noted, "is the misconduct in other cases of the laboratory technician who conducted the DNA test in the appellant's case."  A.R. 102.  It found that Mr. Scott "offers no evidence that the DNA results in his case were tainted or false" and that he "did not seek independent testing of the evidence at the time of his court-martial."  *Id*.  The court also found that "during the providency inquiry, [he] cited a variety of factors in support of his believe that he was guilty of the offense and not just the results of a DNA test."  *Id*.

Undeterred, Mr. Scott filed a third challenge eight years later.  He again asserted that his conviction "was based solely on DNA evidence" tested by Phillip Mills, the examiner whose misconduct was the subject of the laboratory's memorandum.  A.R. 104.  He claimed to have "recently discovered that Dr. Mills destroyed the DNA samples in this case in violation of standard operating procedures, preventing them from being re-tested."  *Id*.  Based on this purported discovery, he again sought a *DuBay* hearing.  He also pointed to an email that a special agent investigating his case once sent to someone in the NCIS laboratory.  This email suggested that Mr. Scott "would never have been charged had it not been for the work you all put into it at the lab.  We had nothing else."  A.R. 106.

The Navy Appeals Court denied this petition too.  It began by reiterating that Mr. Scott pled guilty to rape "[r]elying *in part* upon DNA evidence."  A.R. 199 (emphasis added).  The court found that the petition was "merely an attempt to reevaluate previously considered evidence or legal issues," and that it "decline[d] to do either."  A.R. 201.  Mr. Scott's argument "that because Mills falsified test results in other cases means that he did so in [this] case," it explained, "was rejected by this court in 2007."  *Id*.

The court then assessed a declaration from a laboratory employee, made under the penalty of perjury, which refuted the contention that Mr. Mills destroyed Mr. Scott's DNA samples. *Id*. The employee explained that the laboratory "has neither the mission nor the capacity for a long-term evidence storage facility . . . Mr. Mills was not accused of destroying evidence and there was not an intention to suggest such." *Id*. The court found that this declaration was "supported by documents submitted by [Mr. Scott] which indicate the evidence was destroyed by NCIS, not by Mr. Mills." A.R. 202. It thus concluded that a *DuBay* hearing was unnecessary "as the record as a whole 'compellingly demonstrates' the improbability of the petitioner's assertion." *Id*. (quoting *United States v. Ginn*, 47 M.J. 236, 243-44 (C.A.A.F. 1997)).

Finally, the court considered the special agent's email. It rejected the notion that the DNA test results were the only evidence available to the prosecutors. A.R. 202. It noted, for instance, that "other witnesses put [Mr. Scott] in the room alone with the unconscious victim," that the victim testified in detail about what she observed when she woke up, and that Mr. Scott "was seen outside of the victim's room, using the female [bathroom] because he 'didn't feel like going upstairs' to the male [bathroom] early the next morning." A.R. 202-203. The court was "simply not persuaded that the email the petitioner has produced supports the drastic remedy he now requests." A.R. 203. It therefore denied his petition. Mr. Scott then filed a motion for reconsideration with the Navy Appeals Court and a request for review to the Court of Appeals for the Armed Forces. Both were denied. *See* A.R. 202-206; A.R. 207-312.

Mr. Scott now challenges what he calls the Navy's "continued failure to re-examine the case." Compl. 11. The decisions not to order a *DuBay* hearing or a new trial, he argues, were "a far cry from the standards laid out by the Supreme Court and this Court for rectifying unfair

trials based on fabricated testimony and newly discovered evidence." *Id*. at 13. He also

contends that the "decision of the Judge Advocate General of Navy not to set aside or re-examine

the case . . . was grossly irresponsible, arbitrary[,] and capricious" in violation of § 706(2) of the

APA. *Id*. at 17.

The Government moved to dismiss Mr. Scott's complaint or, in the alternative, sought

summary judgment based on the administrative record. *See* Def.'s Mot. to Dismiss, ECF No. 9

("Def.'s Mot."). It urges the Court to find that the military tribunals followed all applicable legal

standards, and that they gave Mr. Scott's many arguments adequate consideration. *See id*. It

also argues that the APA specifically provides for the non-reviewability of courts martial and

military commissions. *Id*. at 1. Mr. Scott has filed a cross-motion for summary judgment. *See*

Pl.'s Cross-Mot. for Summ. J., ECF No. 10 ("Pl.'s Cross-Mot.").

## II.

To prevail on a motion for summary judgment, a movant must show that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

A factual dispute is material if it could alter the outcome of the suit under the substantive

governing law. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "[A]

party seeking summary judgment always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*,

477 U.S. 317, 323 (1986). Once the movant makes this showing, the non-moving party bears the

burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a claim if it lacks subject matter jurisdiction. The plaintiff bears the burden of proving that the court may hear the claim. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The reviewing court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms. v. FDA,* 402 F.3d 1249, 1253 (D.C. Cir. 2005). But it must still "accept all of the factual allegations in the complaint as true." *Id*. (cleaned up).

### III.

Federal district courts have limited and deferential jurisdiction over decisions of military tribunals. Convicted servicemembers who are still in custody may seek *habeas* review of their court-martial proceedings. *Sanford v. United States*, 586 F.3d 28, 31 (D.C. Cir. 2009). Mr. Scott, of course, is now free. A district court has federal question jurisdiction "to review the validity of court-martial proceedings brought by non-custodial plaintiffs who cannot bring habeas suits." *Id. at* 32 (cleaned up). Thus, the Court can review the constitutionality of the decisions in Mr. Scott's case.

The standard of review to apply is, as the D.C. Circuit has recognized, "tangled." *United States ex rel. New v. Rumsfeld,* 448 F.3d 403, 406 (D.C. Cir. 2006) ("*New II*"). The Supreme Court has held that "when a military decision has dealt fully and fairly with an allegation raised in [a *habeas* petition], it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence." *Burns v. Wilson*, 346 U.S. 137, 142 (1953). Rather, the court is limited to determining whether "the military have given fair consideration to each of [the plaintiff's] claims." *Id*. at 144.

For non-custodial plaintiffs like Mr. Scott, collateral relief is "barred" unless the district court finds that the military tribunals' "judgments were void." *Schlesinger v. Councilman*, 420 U.S. 738, 748 (1975). This means that any error in their decision-making "must be fundamental." *Sanford*, 586 F.3d at 32. Whether a decision is "void" turns on "the nature of the alleged defect and the gravity of the harm from which relief is sought." *Schlesinger*, 420 U.S. at 753.

The Supreme Court "has never clarified the standard of full and fair consideration, and it has meant many things to many courts." *Kauffman v. Sec'y of the Air Force*, 415 F.2d 991, 997 (D.C. Cir. 1969). Nor is the precise level of deference due during a "void" review clear. *See New II*, 448 F.3d at 407. In any event, the D.C. Circuit has expressed "serious doubt [that] the judicial mind is really capable of applying the sort of fine gradations in deference" that the two standards may indicate. *Id*. at 408. Indeed, while the Circuit has sometimes engaged in a *Burns*-style fairness inquiry in the context of non-custodial plaintiffs, other times it has not. *Compare Kauffman*, 415 F.2d at 996-1000, *with Priest v. Sec'y of the Navy*, 570 F.2d 1013, 1015 (D.C. Cir. 1977).

That said, "non-habeas review is if anything more deferential than habeas review of military judgments." *New II*, 448 F.3d at 408. Thus, a military court's judgment cannot be considered void "if it satisfies *Burns's* 'fair consideration' test." *Id*. Recent cases suggest that the latter inquiry has two steps: "(1) a review of the military court's thoroughness in examining the relevant claims, at least where thoroughness is contested; and (2) a close look at the merits of the claim, albeit with some degree of deference . . . ." *Sanford*, 586 F.3d at 32. Here, the Navy Appeals Court thoroughly evaluated Mr. Scott's claims. And the Court finds no reason to disturb its decisions on the merits of these claims.

## IV.

Mr. Scott's Complaint features two causes of action.  First, he alleges that the actions of the military tribunals were "unconstitutional because they do not conform to Supreme Court standards as articulated in federal cases such as *Mesarosh v. United States* and *United States v. Giglio*."  Compl. 12.  Second, he contends that the "administrative decisions of the Department of the Navy and the service courts to uphold" Mr. Scott's conviction were "arbitrary and capricious" in violation of the APA.  The Government is entitled to judgment as a matter of law for the first cause of action and dismissal for the second.

## A.

Mr. Scott's constitutional claims rest on a series of conclusory statements.  He suggests that he was "unjustly convicted" based on "false incriminating evidence."  Compl. 12-13.  He believes the military courts "decided to ignore and suppress the evidence" of the DNA analyst's misconduct.  Compl. 17.  And he sees himself as a victim of "a highly charged atmosphere of hostility towards clemency and exoneration in military sexual assault cases."  Compl. 13.

Nothing in the record supports these statements.  As a result, Mr. Scott's case is readily distinguishable from cases like *Mesarosh* and the principles they stand for.  In *Mesarosh v. United States*, the Government told the Supreme Court it had "serious reason to doubt the truthfulness" of its own witness.  352 U.S. 1, 4 (1956).  In a separate proceeding, this witness had provided "bizarre testimony . . . concerning sabotage, espionage, handling of arms and ammunition, and plots to assassinate Senators, Congressmen, and a state judge . . . ."  *Id*. at 8.  The Government suggested that "none of [this testimony] is worthy of belief."  *Id*.  In fact, the

Solicitor General suggested that the untrue statements "might have been caused by a psychiatric condition" that "may have arisen subsequent to the time of this trial." *Id*.

The *Mesarosh* Court granted the petitioner a new trial because of the unreliability of the witness's testimony. But it explicitly cabined its holding, noting that

> "[i]t must be remembered that we are not dealing here with a motion for a new trial initiated by the defense . . . presenting untruthful statements by a Government witness subsequent to the trial as newly discovered evidence affecting his credibility at the trial. Such an allegation by the defense ordinarily will not support a motion for a new trial, because new evidence which is 'merely cumulative or impeaching' is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial."

*Id*. at 9 (citation omitted).

Indeed, several courts have recognized the narrow scope of *Mesarosh*. *See, e.g.*, *United States v. Burns*, 495 F.3d 873, 875 (8th Cir. 2007) (noting that the holding "has no application to the present case because there is no evidence whatever that [the witness] was a practiced perjurer or suffered from some disqualifying mental condition. There was, moreover, no evidence that he perjured himself in [this] trial."); *United States v. Vogel*, 251 Fed. Appx. 399, 401 (9th Cir. 2007) (describing "*Mesarosh* and its progeny" as being limited to the rare case in which a "critical witness committed perjury or otherwise demonstrated a complete lack of reliability."); *United States v. Anderson*, 933 F.2d 1261, 1275 (5th Cir. 1991) ("No one has presented any proof that [the witness] gave false testimony about material facts, and there has been no recantation of testimony as to material facts.").

In fact, the applicability of *Mesarosh* to the conduct of Mr. Mills, the DNA analyst at issue, has been considered and rejected by a court in this district in a strikingly similar case brought by another hospital corpsman contesting his court-martial for sexual assault. In *Luke v. United States*, Judge Contreras held that the military tribunals "did not act unreasonably in

determining that the plaintiff was not entitled to a new trial because Mill's misconduct did not undermine the integrity of the conviction." 942 F. Supp. 2d 154, 168 (D.D.C. 2013). He added that the analyst was "not entirely discredited in the same way the witness in *Mesarosh* was." *Id*. And, as in this case, the court found "no evidence in the plaintiff's specific conviction that Mills utilized improper procedures, cross-contaminated samples, or perjured himself in any way." *Id*.

Mr. Scott suggests his case is distinguishable from *Luke*. Pl.'s Mot. at 13. It is not. True, the plaintiff in that case was provided a *DuBay* hearing by a military court. *See Luke*, 942 F. Supp. 2d at 165-166. But there is "no case law suggesting that [Mr. Scott] has a right under either constitutional or military law to such a hearing or that the convening officer may not conduct a more limited form of investigation." *Cothran v. Dalton*, 83 F. Supp. 2d 58, 69 (D.D.C. 1999). Rather, the question is whether the officers that heard his claims evaluated them thoroughly and fairly. They did.

The Navy Appeals Court carefully considered each of Mr. Scott's arguments. It rejected as unsubstantiated speculation the contention that the testing in his case was tainted or false. A.R. 102. It reviewed, for example, the laboratory's "remediation project report." A.R. 201. The report noted that the laboratory re-tested 68 of the 435 cases that Mr. Mills worked on from 1995 – 2005. USACIL Quality Manager's Final Report at 68, ECF No. 14-1. In 65 out of the 68 re-tested cases, or roughly 96%, Mr. Mills' DNA conclusions were confirmed. *Id*. The court noted that "[w]hile this report may provide evidence that Mr. Mills falsified DNA results . . . in some of the cases on which he worked, the petitioner offers no evidence the DNA results in his case were tainted or false." A.R. 201.

The tribunal also highlighted several documents "compellingly" demonstrating the improbability of the notion that Mr. Mills destroyed Mr. Scott's DNA samples. A.R. 202. It

evaluated the declaration of Anece Baxter-White, the laboratory's attorney-advisor. A.R. 165-66. This declaration made clear that "[n]o evidence is maintained or retained at the laboratory." A.R. 165. It also confirmed that "Mr. Mills was not accused of destroying evidence and there was not an intention to suggest such." A.R. 166. The court found that documents submitted by Mr. Scott corroborated this declaration, as they showed that "the evidence was destroyed by NCIS, not by Mr. Mills." A.R. 202. Mr. Scott, the court added, "neither offers evidence, nor argues, that NCIS's destruction of the evidence was improper." *Id*. n.6.

Most importantly, the Navy Appeals Court found that Mr. Scott's conviction was not, contrary to his contention, based solely on DNA evidence. *See, e.g.*, A.R. 199; A.R. 203. Mr. Scott maintains that "the only evidence that a victim was 'raped' . . . was the fake DNA lab testing . . ." Compl. 3. Not so. The circumstantial evidence of a rape occurring and him being the perpetrator is considerable:

- Mr. Scott was the last person seen with the victim that night. A.R. 35;

- He admitted to initiating physical contact with the victim after she was no longer conscious. *Id.*;

- Her used tampon was removed and found on the floor of her barracks room, which is certainly suggestive of sexual intercourse. *Id*.;

- Mr. Scott admitted that he was "scared that someone might see [him] leaving the room, so [he] locked [the victim's] door from the inside and left through her window." *Id*.;

- He was spotted in a nearby women's bathroom in the morning. *Id*.;

- She awoke in someone else's boxer shorts. A.R. 29; and

- The bedsheets were missing in the morning and there was blood and what appeared to be semen on her mattress. A.R. 35.

In short, it was reasonable to decide that the weight of the non-DNA evidence and Mr. Scott's admissions of guilt during the providence inquiry were sufficient to sustain his conviction. And it was reasonable to arrive at this decision without conducting a *DuBay* hearing. The record reveals no genuine issues of material fact that permit the Court to conclude otherwise. The actions of the military tribunals that evaluated Mr. Scott's claims were not unconstitutional.

## B.

The Court lacks subject matter jurisdiction to consider Mr. Scott's two APA arguments. First, he contends that the "decision of the Judge Advocate General of Navy not to set aside or re-examine the case pursuant to Article 69 [of the Uniform Code of Military Justice] was grossly irresponsible, arbitrary and capricious." Compl. 17. Second, he suggests that the decisions of "the Article I administrative appellate courts" were "fundamentally defective." Compl. 18.

To begin with, the APA provides for the non-reviewability of "courts martial and military commissions." 5 U.S.C. § 701(b)(1)(F). *See also McKinney v. White*, 291 F.3d 851, 853 (D.C. Cir. 2002). Thus, to the extent that Mr. Scott seeks APA review of the decisions made by the military tribunals, the Court lacks jurisdiction to engage in this review, and dismissal is warranted under Federal Rule of Civil Procedure 12(b)(1). Indeed, he appears to concede this in his briefing. *See* Pl.'s Mot. at 13 (noting that the APA "specifically excludes courts-martial from it [sic] purview).

But he argues that the APA does not "exclude all administrative actions taken by NCIS agents and military justice officials before and after a court-martial. Pl.'s Mot. at 13. True, it "does not expressly preclude review of Judge Advocate General decisions reviewing courts

martial pursuant to [Article 69]." *McKinney*, 291 F.3d at 853. But the D.C. Circuit has found that "Congress' establishment . . . of a separate judicial system for courts martial review is . . . convincing evidence that Congress could not have intended Judge Advocate General review of courts martial to fall within APA review of agency decisions." *Id*. In other words, "Congress' preclusion of APA review of courts martial reaches the Judge Advocate's decision" where it directly concerns a court martial. *Id*. at 855.

The decisions in question here do so. Article 69 of the Uniform Court of Military Justice permits the Judge Advocate General to set aside the findings or sentence in a court-martial case. *See* 10 U.S.C. § 869. If he does, he may also order a rehearing. *Id*. Mr. Scott asks the Court to review decisions not to set aside his conviction and/or order a *DuBay* hearing. Compl. 18. This is precisely the type of review barred by the APA.

Lastly, Mr. Scott attacks what he calls the "failure of the [Judge Advocate General] to . . . provide information and discovery to the detailed appellate defense counsel." Pl.'s Mot. at 13. In his Complaint, Mr. Scott details several requests he made to the Office of the Judge Advocate General for information about his case and appeals. *See* Compl. 9-10. But the Complaint itself demonstrates that the Office responded to each of these requests or identified for Mr. Scott the appropriate procedural mechanisms to obtain the information he sought. *Id*. Thus, Mr. Scott has not sufficiently alleged any decision by the Judge Advocate General that this Court may review under the APA, and his claims will be dismissed. *See Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011) ("In deciding a motion to dismiss challenging the Court's subject-matter jurisdiction under Rule 12(b)(1) courts are not required to accept inferences unsupported by the facts or legal conclusions that are cast as factual allegations.") (cleaned up).

**V.**

For these reasons, the Government's Motion to Dismiss or in the Alternative, Motion for Summary Judgment will be granted.  Mr. Scott's Cross-Motion for Summary Judgment will be denied.  A separate order will issue.

Dated: December 18, 2018

_____
TREVOR N. McFADDEN
United States District Judge